# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CENTRAL DIVISION

BEVERLY J. ESTORGA,

         Plaintiff,

vs.

COMMISSIONER OF SOCIAL
SECURITY,[1]

         Defendant.

No. 17-CV-3044-LRR

**REPORT AND RECOMMENDATION**

---

Plaintiff Beverly J. Estorga seeks judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying his[2] application for supplemental security income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f.[3] Estorga argues that the administrative law judge (ALJ) erred by failing to include the severe impairment of a somatoform or conversion disorder at step two, in evaluating his subjective complaints and medical opinions when determining residual functional capacity (RFC), and in forming a hypothetical for the vocational

---

[1] Under Federal Rule of Civil Procedure 17(d), "[a] public officer who . . . is sued in an official capacity may be designated by official title rather than by name." *See also Edwards v. Comm'r of Soc. Sec*, No. 7:17-CV-00052-RN, 2018 WL 1413974, at *1 n.1 (E.D.N.C. Mar. 21, 2018); *see also, e.g.*, *Gates v. Comm'r, Soc. Sec. Admin.*, 721 F. App'x 575 (8th Cir. 2018) (per curiam); *Stanley v. Comm'r, Soc. Sec. Admin.*, 720 F. App'x 818 (8th Cir. 2018) (per curiam); *Shelton v. Comm'r, Soc. Sec. Admin*, 716 F. App'x 574 (8th Cir. 2018) (per curiam).

[2] Treatment records reflect that around June 2015, Estorga came out as transgender (AR 2726), and at the hearing in October 2015, Estorga testified that he prefers to be called Mr. Estorga, not Ms. Estorga (AR 67). I thus use male pronouns when referring to Estorga.

[3] Estorga concurrently filed an application for disability insurance benefits under Title II that the ALJ dismissed because "the alleged disability onset date . . . . [wa]s after the claimant's date last insured." AR 24. Estorga does not challenge this finding on appeal.

expert (VE). I recommend **reversing** the Commissioner's decision and **remanding** for further proceedings.

## I. BACKGROUND[4]

Estorga filed an application for SSI benefits on July 30, 2012, alleging disability based on endometriosis, polycystic ovarian syndrome, chronic gastritis, fibromyalgia, psoriatic or autoimmune arthritis, "persistent scar tissue back and right foot," bipolar disorder, depression, and posttraumatic stress disorder (PTSD). AR 24, 117-18.[5] Estorga has not worked full-time since 2006, and he stopped working altogether in 2008, although he obtained a bachelor's degree in sociology in June 2010 from the University of California, Santa Cruz (he reported he planned to obtain a master's degree, but health problems prevented it). AR 62, 69, 410, 421, 750, 2363. Prior to October 2014, Estorga lived in California with his two children and partner, who financially supported Estorga and the children. AR 83, 2368, 2251. After Estorga split from his partner, he moved to Iowa with the children to live with his mother; he later moved out, and at the time of the hearing in October 2015, he was living alone with his children (ages 15 and 11) and being supported financially by his mother. *See* AR 71, 83, 2368, 2540, 2576, 2697, 2741.

Estorga's SSI application was denied initially in January 2013 and on reconsideration in September 2013. AR 117-136, 159-180. At a hearing before an ALJ in May 2014, the ALJ noted that Estorga "had difficulty ambulating in here," which "made [him] think that maybe . . . there's something here," "despite th[e] lousy medical source statement" from Dr. Robert Weber, Estorga's primary care physician in California. AR 59. The ALJ noted, however, that he "need[ed] proof," so he ordered two consultative examinations: a neurological examination to evaluate Estorga's

---

[4] For a more thorough overview, see the Joint Statement of Facts (Doc. 12).

[5] "AR" refers to the administrative record below, filed at Docs. 9-1 to 10-8.

Case 3:17-cv-03044-LRR-KEM    Document 19    Filed 06/22/18    Page 2 of 31

fibromyalgia, and an internal medicine examination to evaluate Estorga's pelvic pain and psoriatic arthritis. AR 59-60.

Estorga met with Dr. Daniel Katzenberg on June 28, 2014, for the neurological consultative examination. Dr. Katzenberg's testing revealed limited mobility in Estorga's hips, "multiple trigger points" of the musculoskeletal system, and an antalgic gait and inability to hop or balance on one foot. AR 2205. Based on these findings, Dr. Katzenberg "confirm[ed] the diagnosis of fibromyalgia," which he opined (in combination with arthritis) was "the main source of [Estorga's] functional limitations." AR 2206. Dr. Katzenberg's findings supported Estorga's use of a cane, which Estorga presented with at the examination. AR 2204-05. Dr. Katzenberg concluded that Estorga was limited in his ability to stand, walk, lift, carry, stoop, kneel, crouch, and crawl, but not in his ability to sit or use his hands. AR 2205-2210.

On October 6, 2014, Dr. Paul Anderson conducted the internal medicine consultative examination. AR 2363-74. Although he recognized that Estorga suffered from psoriatic arthritis, he found no objective medical signs of it, and he concluded that it was "fairly well controlled on current medications." AR 2367, 2371. Most of Dr. Anderson's objective examination was unremarkable, and he noted that Estorga did not give his best effort on the physical tests. AR 2367-68. Dr. Anderson concluded that Estorga's "major problems have to do with h[is] psychiatric issues[,] which appear not to have been completely sorted out." AR 2368. Nevertheless, Dr. Anderson completed a form evaluating Estorga's physical limitations (including his ability to sit, stand, walk, reach, handle, and finger), although he noted on the form that his testing was unreliable. AR 2370-71. Dr. Anderson did not find Estorga needed to use a cane or assistive device to walk. AR 2370.

Estorga also submitted as evidence a medical opinion from Dr. Byron Carlson, his primary care physician in Iowa. AR 2667, 2751-56. Dr. Carlson found Estorga limited in his ability to sit, stand, and walk based on his "observation of [his] abilities." He also limited Estorga's ability to use his hands, stoop, kneel, crouch, and crawl based on

3

weakness and unsteadiness. AR 2752-53. He opined that Estorga needed a cane to walk farther than fifteen feet. AR 2752, 2756.

A second administrative hearing before an ALJ was held by video on October 16, 2015, at which Estorga and a VE testified. AR 65-66. On March 22, 2016, the ALJ issued a written opinion following the familiar five-step process outlined in the regulations[6] to find Estorga was not disabled during the relevant time period of July 30, 2012, to the date of the opinion. AR 42. At step two, the ALJ found Estorga suffered from the severe impairments of "psoriatic/rheumatoid arthritis, fibromyalgia, depression, anxiety/[PTSD], and vision loss in the right eye." AR 26. The ALJ addressed some other impairments, finding them nonsevere, but did not mention the possibility that Estorga suffered from a conversion or somatoform disorder. AR 26-27. To evaluate whether Estorga's impairments prevented him from performing his past work or other work (at steps four and five), the ALJ determined Estorga's RFC[7] and found he could perform sedentary work with additional limitations:

> [He] could only occasionally climb ramps and stairs. [He] should never climb ladders, ropes, or scaffolds. There should be no requirement to balance. [He] could occasionally stoop, kneel, crouch, and crawl. [He] would require a cane for ambulation. [He] would have no vision with the right eye. [He] should have no exposure to hazards, such as dangerous machinery or unprotected heights. [He] would need to avoid even moderate exposure to extremes of cold. [He] could perform frequent handling and

---

[6] "The five-part test is whether the claimant is (1) currently employed and (2) severely impaired; (3) whether the impairment is or approximates a listed impairment; (4) whether the claimant can perform past relevant work; and if not, (5) whether the claimant can perform any other kind of work." *King v. Astrue*, 564 F.3d 978, 979 n.2 (8th Cir. 2009); *see also* 20 C.F.R. § 404.1520(a)(4). The burden of persuasion always lies with the claimant to prove disability, but during the fifth step, the burden of production shifts to the Commissioner to demonstrate "that the claimant retains the RFC to do other kinds of work[] and . . . that other work exists." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004)).

[7] RFC is "'what the claimant can still do' despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (quoting *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987)).

4

fingering, bilaterally. [He] would be limited to simple, routine tasks with short, simple instructions and only occasional workplace changes. [He] could have occasional interaction with the public, coworkers, and supervisors.

AR 28. When determining RFC, the ALJ considered the opinions of Drs. Katzenberg, Anderson, and Carlson, assigning them varying amounts of weight. AR 35-37. The ALJ also considered Estorga's subjective complaints, which he did not fully credit, as well as other evidence. AR 39-40. The ALJ found that Estorga could not perform his past relevant work but that he could work as an addresser, document preparer, or sorter. AR 41-42.

The ALJ gave several reasons for the weight he assigned to Estorga's subjective complaints, including that although he "stated [he] has never used drugs or alcohol[, t]his appears inconsistent with prior medical records which indicate the claimant has been treated for alcoholic cardiomyopathy and was consuming two pints of whiskey per day in 2009." AR 33; *see also* AR 27 (noting Estorga's "cardiac function largely normalized after giving up alcohol" and finding that cardiomyopathy was not a severe impairment at step two); AR 56 (at the first hearing, the ALJ asked the testifying medical expert whether Estorga's limitations are caused by alcohol, and he responded that his alcohol abuse "was a long [way] back" and that once Estorga stopped drinking, his "heart recovered completely"). In making this finding, the ALJ relied on medical records belonging to somebody else that had accidentally been submitted with Estorga's records. Estorga raised this issue to the Appeals Council, but the Appeals Council "found that this information does not provide a basis for changing the [ALJ's] decision" and declined to grant review. AR 1-3, 15-16. The Appeals Council "removed as an exhibit" the medical records that did not belong to Estorga. AR 787-91.

The ALJ's decision is the final decision of the Commissioner. *See* 20 C.F.R. § 404.981. Estorga filed a timely complaint in this court, seeking judicial review of the Commissioner's decision (AR 1-3; Doc. 3). *See* 20 C.F.R. § 422.210(c). The parties

briefed the issues (Docs. 13, 16,[8] 17), and the Honorable Linda R. Reade, United States District Judge for the Northern District of Iowa, referred this case to me for a Report and Recommendation.

## II.    DISCUSSION

A court must affirm the ALJ's decision if it "is supported by substantial evidence in the record as a whole." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *see also* 42 U.S.C. § 405(g).  "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Kirby*, 500 F.3d at 707.  The court "do[es] not reweigh the evidence or review the factual record de novo." *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994).  If, after reviewing the evidence, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [ALJ's] findings, [the court] must affirm the decision." *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

Estorga challenges the ALJ's failure to find he suffers from a conversion or somatoform disorder at step two; the ALJ's failure to fully credit his subjective complaints; the weight the ALJ assigned to the medical opinions of Drs. Katzenberg, Anderson, and Carlson when determining RFC; and the hypothetical posed to the VE.  I address each of these arguments in turn.

---

[8] The Commissioner's brief was filed thirty-seven minutes late.  Docs. 11, 16.  I have noticed that late briefing is not an uncommon occurrence in Social Security appeals.  I am starting to keep track of attorneys who file briefs late and in the future, may require a showing of good cause, especially for repeat offenders (I also note that attorneys of record, whether or not they sign the brief, are responsible for ensuring the brief is timely filed or that an extension is requested).  Because the brief was less than an hour late, however, I decline to take action at this time.

## A. Step-Two Determination

Estorga argues that the ALJ erred at step two because the ALJ did not address whether he suffered a conversion or somatoform impairment, severe or otherwise. A conversion or somatoform disorder "causes [a person] to believe that [the person's] physical ailments are more serious than the clinical data would suggest. . . . In other words, [a person suffering this disorder] experiences . . . physical problems as worse than they may in fact be, and is unable to control this response." *Easter v. Bowen*, 867 F.2d 1128, 1129 (8th Cir. 1989). It is considered a mental impairment to which the "special technique" outlined in the regulations for evaluating the severity of mental impairments applies. *See Sharpe v. Comm'r of Soc. Sec.*, No. 1:14-CV-184-TFM, 2015 WL 4255308, at *5 (W.D. Pa. July 14, 2015); *Iverson v. Astrue*, No. C12-391-MJP-BAT, 2012 WL 5330978, at *4 (W.D. Wash. Oct. 9, 2012), *report and recommendation adopted*, 2012 WL 5330976 (W.D. Wash. Oct. 29, 2012); *Wamsley v. Astrue*, 780 F. Supp. 2d 1180, 1191 (D. Colo. 2011).

During step two, whether evaluating a physical or mental impairment, the ALJ must first "determine whether [a claimant] ha[s] a medically determinable . . . impairment" that "result[s] from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 416.921; *see also* 20 C.F.R. § 416.920a(b)(1). An impairment "must be established by objective medical evidence from an acceptable medical source." 20 C.F.R. § 416.921. Here, there is very little evidence in the more than 2,000 pages of treatment records that Estorga suffers from a conversion disorder.

Estorga primarily relies on emergency room records from a four-day hospitalization from July 18 to 22, 2014. *See* AR 2215-2232. Estorga presented to the emergency room complaining of paralysis and weakness in both his legs, although he still had sensation. AR 2217. He stated that two days before, he had been suffering from back pain, weakness, and nausea and that while walking to the bathroom, his right leg suddenly gave out, and he collapsed. AR 2229. He was able to get up, but the next day,

7

he lost strength in both his legs, and he also reported urinary incontinence. AR 2229-30. After observing him during physical therapy and running several tests (including a computed tomography (CT) scan and a magnetic resonance imaging (MRI)), which came back negative, a neurologist concluded that she "highly suspect[ed]" Estorga's leg weakness was the result of a "conversion reaction." AR 2228. Through physical therapy, Estorga regained some strength and felt comfortable going home, and he was discharged with a diagnosis of "bilateral lower extremity weakness secondary to conversion disorder." AR 2214. The only other mention of conversion disorder in the record appears in three treatment records from shortly after Estorga's hospitalization, in which Estorga's psychiatrist noted that he needed to "rule out" a conversion disorder. AR 2262, 2275, 2277. In the first of these treatment records, from July 31, 2014, the psychiatrist also noted that Estorga believed he could have spinal stenosis, not a conversion disorder, and that Estorga planned to consult with a different neurologist for a second opinion. AR 2262.

Estorga also points to evidence in the record suggesting that his physical symptoms are exacerbated by stress and other mental symptoms. Notes from an in-home nursing visit on June 23, 2015, reflect that Estorga reported an increase in stress and pain (and an increase in suicidal thoughts) because his children were out of state visiting their father for the summer. AR 2464. In a psychological evaluation from June 26, 2015—when Estorga was voluntarily receiving inpatient treatment due to suicidal ideation—a psychologist noted that Estorga's test results on the Minnesota Multiphasic Personality Inventory 2 (MMPI-2) reflected that Estorga "might tend to experience increased complaints [of fatigue, weakness, and/or chronic pain] in response to stress or interpersonal difficulties, but it would also be important to consider medical causes for any physical complaints." AR 2537. And in September 2015, during an initial consultation with a rheumatologist, Estorga reported that his pain is aggravated by movement and emotional stress. AR 2764. Estorga's reports are insufficient to establish

8

a medically determinable impairment, as is a treatment note reflecting the possibility that his physical ailments are psychosomatic.

Estorga also relies on Dr. Anderson's report from his consultative examination, which noted that Estorga's "major problems have to do with h[is] psychiatric issues" and that he "does not give h[is] best effort on the physical examination." AR 2368. It does not seem that Dr. Anderson believed Estorga's physical problems were psychosomatic, but rather, that he believed Estorga's main impediment to employment resulted from his mental limitations, not physical limitations. Estorga points to evidence that his mental symptoms may worsen during periods of heightened pain (*see* AR 753-54, 1548, 1806), but this is irrelevant to whether his physical symptoms are exacerbated by his mental impairments. Finally, Estorga points to evidence in the treatment records that medications often cause him side effects. From this, he infers that "[w]hen Estorga was aware of a possible side effect of a given treatment, []he generally would end up suffering that side effect to such an extreme degree []he would end up in an emergency room or see other providers about that side effect." Doc. 13 at 7. Estorga points to no evidence that any medical provider made this connection or found that Estorga's side effects were psychologically based.

Estorga did not allege a conversion or somatoform disorder as an impairment in either his SSI application or at the hearing, which is "significant." *See Dunahoo v. Apfel*, 241 F.3d 1033, 1039-40 (8th Cir. 2001); *see also Gregg v. Barnhart*, 354 F.3d 710, 713 (8th Cir. 2003) ("[A]n ALJ is not obliged 'to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability.'" (quoting *Pena v. Chater*, 76 F.3d 906, 909 (8th Cir. 1996))). The only evidence in the record to support a conversion disorder impairment are the treatment records from Estorga's July 2014 hospitalization. The record reflects only one diagnosis of conversion disorder (as the cause for paralysis in Estorga's legs), and later treatment notes reflect that conversion disorder still needed to be "rule[d] out" and that Estorga wished to seek a second opinion from a neurologist regarding his conversion diagnosis. Substantial

9

evidence supports that Estorga does not suffer from a conversion or somatoform disorder, and the ALJ did not err by failing to address the existence of this impairment. *See Brockman v. Sullivan*, 987 F.2d 1344, 1348 (8th Cir. 1993) (holding that the ALJ did not err in failing to investigate or find that the claimant suffered from schizophrenia when the claimant did not allege this as an impairment in his application or at the hearing and "[t]he only medical evidence . . . to support this theory was a ten-year-old diagnosis" contained in a letter to the state Disability Determinations Center).

The cases relied on by Estorga are distinguishable. In *Pratt v. Sullivan*, 956 F.2d 830, 835 (8th Cir. 1992) (per curiam), the ALJ applied the wrong standard at step two, conflating it with the step-three standard (the ALJ required the claimant's symptoms to meet the listing requirements of somatoform disorder to find it a medically determinable impairment). And in *Easter*, 867 F.2d at 1130, and *Nowling v. Colvin*, 813 F.3d 1110, 1118-20 (8th Cir. 2016), the ALJ recognized that the claimant suffered from a somatoform disorder at step two but did not adequately consider the effects of that condition during other steps of the disability determination. I recommend affirming the ALJ's step-two determination based on my finding that the ALJ did not err by failing to include a somatoform or conversion disorder as a medically determinable impairment.

### B. Subjective Complaints

In connection with his step-two argument, Estorga contends:

> In the ALJ's explanation for his [RFC] finding, the thrust of why he found Estorga was not credible was h[is] allegations were not consistent with the objective medical evidence . . . . [T]he ALJ read much into the perceived gap between the severity of Estorga's physical complaints and the objective medical evidence for h[is] physical impairments, and failed to consider whether that gap was reasonably explained by h[is] conversion disorder.

Doc. 13 at 8-9. In that same section, Estorga also argues that the ALJ denied Estorga benefits due to a failure to follow treatment without considering Estorga's reasons for failing to follow treatment, as required. *Id.* at 9-10. I construe these arguments as

challenging the ALJ's reasoning for not fully crediting Estorga's subjective complaints based on the lack of objective medical evidence and a failure to follow treatment. Estorga also explicitly challenges the weight the ALJ assigned to his subjective complaints, arguing that the ALJ erred by relying on medical records belonging to another person and that this error was not harmless. *Id.* at 17-19.

When evaluating a claimant's subjective complaints—including pain or nervousness—the ALJ must consider the factors set forth in *Polaski v. Heckler*: "(1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions." *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998); *accord Polaski*, 739 F.2d 1320, 1321-22 (8th Cir. 1984), *vacated*, 476 U.S. 1167 (1986), *reinstated*,[9] 804 F.2d 456 (8th Cir. 1986). "Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints." *Black*, 143 F.3d at 386. The ALJ may not discredit the claimant's allegations based solely on the absence of objective medical evidence, but the ALJ may rest his credibility finding on "objective medical evidence to the contrary," *Ramirez v. Barnhart*, 292 F.3d 576, 581 (8th Cir. 2002); or "inconsistencies in the record as a whole," *Brockman*, 987 F.2d at 1346. Courts must "defer to an ALJ's credibility finding as long as the 'ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so.'" *Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007) (quoting *Hogan v. Apfel*, 239 F.3d 958, 962 (8th Cir. 2001)).

In the section of the ALJ's opinion discussing the weight given to Estorga's subjective complaints, the ALJ gave several reasons for not fully crediting Estorga:

---

[9] The court did not explicitly say that it was reinstating the original *Polaski* opinion, but the Eighth Circuit has recognized that it "effectively reinstat[ed]" *Polaski*. *Jones v. Callahan*, 122 F.3d 1148, 1151 n.3 (8th Cir. 1997).

(1) Estorga's alleged deficits in memory and concentration are inconsistent with treatment records showing normal findings in those areas (Estorga does not challenge this determination; from my review of the treatment notes, Estorga rarely complained of memory or concentration problems, and objective examinations were also normal, as found by the ALJ); (2) Estorga failed to follow certain prescribed treatments; (3) Estorga's complaints were not supported by findings on objective examination; and (4) the record contains "discrepancies" calling Estorga's credibility into question. AR 39-40. The ALJ did not mention Estorga's alcohol use when discussing the weight to assign Estorga's subjective complaints. Earlier in his opinion, however (when discussing the weight to assign Dr. Aparna Dixit's RFC opinion), the ALJ noted that Estorga's statement to Dr. Dixit that he had never used alcohol was inconsistent with treatment records from 2009 showing that Estorga abused alcohol. AR 33. These 2009 treatment records did not belong to Estorga, and the ALJ therefore erred in finding Estorga's statement to Dr. Dixit regarding alcohol inconsistent with his treatment records. But I agree with the Commissioner that this error was harmless: the ALJ only mentioned the incorrect records once in his thirteen-page discussion of Estorga's RFC (and not during the discussion of the weight to assign Estorga's subjective complaints), and the ALJ gave several other reasons for discrediting Estorga's subjective complaints. *See, e.g.*, *King v. Colvin*, No. 13-CV-3039-LTS, 2014 WL 1344194, at *14 (N.D. Iowa Apr. 4, 2014); *cf. Watkins v. Astrue*, 414 F. App'x 894, 896-97 (8th Cir. 2011) (per curiam) (remand required when ALJ "relied *primarily* on [claimant's] noncompliance with treatment recommendations" to discredit his mental health symptoms without addressing whether such failure was justified (emphasis added)).

One of the ALJ's stated reasons for discrediting Estorga is that Estorga did not receive psychotherapy treatment regularly, despite numerous providers recommending it, and he regularly missed doses of Seroquel and Ambien. AR 40. Social Security Ruling (SSR) 16-3p provides:

[The Social Security Administration] will consider an individual's attempts to seek medical treatment for symptoms and to follow treatment once it is prescribed when evaluating whether symptom intensity and persistence affect the ability to perform work-related activities . . . . Persistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent.

In contrast, if the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, [the Social Security Administration] may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record. [The Social Security Administration] will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints. [The Social Security Administration] may need to contact the individual regarding the lack of treatment or, at an administrative proceeding, ask why he or she has not complied with or sought treatment in a manner consistent with his or her complaints. When [the Social Security Administration] consider[s] the individual's treatment history, [the Social Security Administration] may consider (but are not limited to) one or more of the following:

• An individual may have structured his or her activities to minimize symptoms to a tolerable level by avoiding physical activities or mental stressors that aggravate his or her symptoms.

• An individual may receive periodic treatment or evaluation for refills of medications because his or her symptoms have reached a plateau.

• An individual may not agree to take prescription medications because the side effects are less tolerable than the symptoms.

• An individual may not be able to afford treatment and may not have access to free or low-cost medical services.

• A medical source may have advised the individual that there is no further effective treatment to prescribe or recommend that would benefit the individual.

• An individual's symptoms may not be severe enough to prompt him or her to seek treatment, or the symptoms may be relieved with over the counter medications.

• An individual's religious beliefs may prohibit prescribed treatment.

13

- Due to various limitations (such as language or mental limitations), an individual may not understand the appropriate treatment for or the need for consistent treatment of his or her impairment.
- Due to a mental impairment (for example, individuals with mental impairments that affect judgment, reality testing, or orientation), an individual may not be aware that he or she has a disorder that requires treatment. . . .

The above examples illustrate possible reasons an individual may not have pursued treatment. However, [the Social Security Administration] will consider and address reasons for not pursuing treatment that are pertinent to an individual's case. [The Social Security Administration] will review the case record to determine whether there are explanations for inconsistencies in the individual's statements about symptoms and their effects, and whether the evidence of record supports any of the individual's statements at the time he or she made them. [The Social Security Administration] will explain how [it] considered the individual's reasons in [its] evaluation of the individual's symptoms.

81 Fed. Reg. 14166, 14170-71 (Mar. 16, 2016); *see also Watkins*, 414 F. App'x at 898 (Colloton, J., concurring).

As the ALJ noted, treatment records reflect Estorga received limited psychotherapy. Estorga expressed interest in receiving psychotherapy in June 2013, but he remained on a wait list until a full year later. AR 1533, 1855, 2054, 2057, 2060, 2246. Once off the wait list, he had three psychotherapy sessions in California in June and July 2014, missing other appointments with excuses such as he "thought that [the] session was for yesterday," he "was too sick to speak," or he had a consultative examination for the Social Security Administration. AR 2246-54. After failing to hear from him for three weeks, his therapist closed his case (during a four-day period in which Estorga was hospitalized with temporary paralysis in his legs). AR 2214-31, 2249. The next week, Estorga called and explained that he had been hospitalized and was "learn[ing] to walk" again, but no further treatment records appear from this provider. AR 2248. In October 2014, Estorga moved to Iowa. He did not begin psychotherapy in Iowa until May 2015; the record reflects four sessions. AR 2721-2727.

14

Even when Estorga was not receiving psychotherapy, he was regularly prescribed psychiatric medications (either from a psychiatrist or from his primary care physician). As the ALJ noted, Estorga reported in May 2015 that Seroquel extended release (in combination with immediate release) improved his bipolar symptoms. AR 2741. At that same appointment, he reported regularly skipping Seroquel because it caused grogginess. AR 2730. A later treatment note reflects Estorga's parents paid $260 a month for his Seroquel because it was not covered by insurance (suggesting Estorga could not afford it himself) and that Estorga reported feeling tired for five to six hours upon waking due to Seroquel. AR 2741-42. The ALJ also noted that in May 2015, Estorga reported that he did not take Ambien very often (which was only prescribed as needed), which the ALJ found inconsistent with Estorga's testimony that his sleep medications (except for Seroquel) have been largely ineffective. AR 40, 2484, 2730. Numerous treatment records reflect Estorga had difficulty sleeping prior to being prescribed Seroquel extended and immediate release, including observations of providers during inpatient treatment, and the ALJ did not consider the side effects caused by Ambien (it made Estorga eat too much). *Id.*

As Estorga argues, the ALJ did not address Estorga's reasons for failing to attend psychotherapy or to take Seroquel or Ambien (e.g., cost, side effects) as required by SSR 16-3p. Moreover, even if the ALJ had done so, here, Estorga's treatment for his physical ailments suggests "intense and persistent" symptoms under SSR 16-3p. 81 Fed. Reg. at 14170. As the ALJ noted, the record here contains more than 2,000 pages of treatment records (although some are duplicates), which mostly reflect Estorga seeking treatment for physical ailments. Estorga has tried numerous prescription medications to help his pain, many of which have been discontinued due to adverse side effects (often resulting in hospitalization) and are serious drugs used to treat pain (such as opioids and Remicade, a chemotherapy drug that caused Estorga to lose all his hair). Treatment records reflect Estorga also reported trying more unconventional treatments such as acupuncture and deep tissue massages (the first of which caused spasms and the second of which did not

15

provide lasting relief). AR 1951; *see also* AR 1281, 1931 (physical therapy). Thus, Estorga's "lack of" treatment cannot provide a basis for diminishing his subjective complaints of pain and weakness.

The ALJ also found that Estorga's complaints of weakness and swelling were not supported by the objective medical evidence, which the ALJ found "reflect[s] . . . full motor strength throughout the upper extremities, lower extremities, and grip, with no indication of sensory or reflex deficits." AR 39. Estorga's neurological examinations were almost always normal, including sensation and deep tendon reflexes. *See* AR 1231, 1235, 1246, 1271, 1288, 1477, 1627, 1668, 1673, 1678, 1681, 1684, 1692, 1775, 1780, 1782, 1792, 1801, 1809, 1934, 2188, 2270, 2370, 2574, 2585, 2612, 2626, 2631, 2638, 2659, 2765; *but see* AR 2231 (mostly normal neurological examination during Estorga's hospitalization for temporary leg paralysis in July 2014, including normal deep tendon reflexes in the upper extremities and knees, but absent reflexes in the Achilles tendon in the heel down to the toes). Normal neurological examinations do not seem inconsistent, however, with weakness, swelling, or difficulties gripping and grasping caused by arthritis or fibromyalgia.

Objective analyses of Estorga's strength were also mostly normal. *See* AR 1477 (December 2012), 1934 (January 2012), 2270 (August 2014), 2386 (September 2014), 2577 (December 2014), 2585 (November 2014), 2610 (February 2015), 2557 (May 2015), 2765 (August 2015). Two exceptions include in July 2014, during a hospitalization for temporary paralysis in both legs, when providers noted normal arm strength but diminished power and "giveaway strength" in both legs; and in May 2015, when Estorga had decreased strength in his hips, knees, ankles, and feet. AR 2214-15, 2224, 2227, 2638-39; *see also* AR 2079 (provider noted in August 2013 that Estorga appeared "tired [and] weak"). Although the strength evidence seems more relevant than the neurological findings, the ALJ found Estorga suffered from fibromyalgia, which "the Eighth Circuit [has] recognized . . . is a chronic condition involving inflammation of the fibrous and connective tissue, 'causing long-term but variable levels of muscle and joint

16

pain, stiffness, and fatigue.'" *Baker v. Astrue*, No. 4:05CV2253 FRB, 2009 WL 510102, at *17 (E.D. Mo. Mar. 2, 2009) (quoting *Brosnahan v. Barnhart*, 336 F.3d 671, 672 n.1 (8th Cir. 2003)). Several courts have recognized that "[l]ittle can be gleaned from the fact that [a claimant's] range of motion and other musculoskeletal and neurological examinations were essentially normal," as that is often "the case with fibromyalgia patients." *Fickler v. Colvin*, No. 8:11CV440, 2013 WL 1090405, at *22 (D. Neb. Mar. 15, 2013); *see Miller v. Colvin*, 114 F. Supp. 3d 741, 765-66 (D.S.D. 2015) (noting that "[t]he musculoskeletal and neurological examinations are normal in fibromyalgia patients" and that "trigger points are the only 'objective' signs of fibromyalgia" (alteration in original) (quoting *Johnson v. Astrue,* 597 F.3d 409, 410, 412 (1st Cir. 2009)); *see also Cline v. Colvin*, 771 F.3d 1098, 1105 (8th Cir. 2014) (Bright, J., dissenting) ("[P]hysical examinations of those with fibromyalgia 'will usually yield normal results—a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions.'" (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 108-09 (2d Cir. 2003)). Providers often noted tenderness in various places on Estorga's body, consistent with fibromyalgia. *See* AR 1290, 1692, 2079, 2110, 2121, 2190, 2192, 2194, 2196, 2265, 2594, 2607, 2610, 2638-39, 2659, 2765; *but see* AR 1242, 1627, 1775, 1782, 1792, 2009, 2102, 2125, 2130, 2270, 2386, 2577, 2649. Moreover, as the ALJ noted, Estorga often presented at medical appointments with a cane or walker, and numerous treatment notes (particularly later treatment notes) reflect objective observations of his difficulty walking.[10] That objective tests showed normal muscle

---

[10] *Compare* AR 1246, 1271, 1288, 1477, 1580, 1668, 1673, 1809, 2010, 2185, 2188, 2367, 2370 (normal gait noted in treatment notes from February 2012 to July 2013, as well as at a consultative examination in October 2014), *with* AR 1691 (December 2012: "seems in pain when gets up to walk"), AR 1692 (December 2012: can "barely[ ]walk"; must use cane and hold on to significant other), AR 2082 (December 2013: gait within normal limits but uses a cane to get around), AR 1533, 1855, 2051, 2054, 2057, 2060 (June to September 2013, February 2014, April 2014: psychiatrist notes slow and walks using cane), AR 2205 (June 2014: "[g]ait is somewhat broad based and antalgic"; cane is "medically indicated"), AR 2214-15, 2227 (July 2014: discharged with walker after being hospitalized with temporary leg paralysis; "some

strength and neurological findings does not provide a good reason for discrediting Estorga's subjective complaints of weakness based on the severe impairments at issue here.

I have found only three instances in the treatment notes in which providers evaluated Estorga's hand or grip strength (I have reviewed the evidence cited by the ALJ, but the ALJ cites generally to 15 exhibits totaling 697 pages). AR 39. In December 2012, during a consultative examination, the doctor found Estorga had normal grip strength, although the doctor noted pain with grip testing (he questioned this pain, however, noting that Estorga reported pain with every movement and test, despite being able to get on and off the examination table "with ease" without complaining of low back or leg pain). AR 1477. In October 2014, during a consultative examination, Dr. Anderson found what appears to be somewhat abnormal results during grip strength testing, but he noted "[i]t appears that [Estorga] is not giving full effort." AR 2367. And in March 2015, a provider noted limited strength in Estorga's left hand. AR 2619. These treatment notes do not constitute substantial evidence that Estorga had full grip strength during objective testing, as suggested by the ALJ.[11]

giveaway strength" noted during objective examination), AR 2251 (July 2014: psychotherapist notes limped into session and walked very slowly), AR 2262 (July 2014: psychiatrist notes walks slowly using walker), AR 2275, 2325 (August 2014: while admitted for psychiatric inpatient treatment for suicidal ideation, providers observed "slow movements that are labored" with the "walker at h[is] side" and "walking with h[is] walker very slowly and careful[ly]"), AR 2381, 2386 (September 2014: normal gait but walks slowly with walker), AR 2594 (October 2014: using walker), AR 2619 (March 2015: unstable gait; uses walker), AR 2638 (May 2015: antalgic gait on both sides; uses walker), AR 2741 (August 2015: walks slowly, unaided), AR 2415, 2418, 2429, 2435, 2447, 2451, 2457, 2461, 2467, 2687, 2690, 2694, 2711, 2713, 2715, 2723, 2797 (home healthcare notes from April to August 2015 reflect at various times slow steady gait with walker or cane "as needed"; using cane or walker and slow steady gait; unsteadiness or difficulty walking; and pain and weakness affecting Estorga's ability to walk).

[11] Other treatment notes reflect objective evaluations of Estorga's hands other than grip strength. In June 2014, Dr. Katzenberg found Estorga had full range of motion in his hands, and in July 2015, Dr. Carlson found the same. AR 2205, 2676. A few home healthcare notes (from April through August 2015) reflect no joint swelling or tenderness (AR 2412, 2429, 2439, 2453), but there are more such notes finding the opposite (AR 2415, 2418, 2423, 2427, 2435, 2442, 2447,

The December 2012 and October 2014 treatment notes, however, do support the ALJ's determination that several providers have noted Estorga's inconsistent or diminished effort during physical examinations (particularly consultative examinations ordered by the Social Security Administration). AR 40; *see also* AR 1303, 1434-35 (primary care provider in October 2011 questioned Estorga's complaints of being too fatigued to work or to look for a job, noting that Estorga wanted to have another baby and that methotrexate did not usually cause debilitating fatigue in patients; the provider did not want to fill out a disability form on Estorga's behalf); AR 1535 (psychiatrist finds "no real notes of anxiety other than subjective" in January 2013); AR 2214-31 (during hospitalization for temporary paralysis in legs, providers note Estorga initially gave no effort during strength testing of his legs but improved "with encouragement"; Estorga was ultimately discharged, however, with a diagnosis of conversion disorder, meaning that providers found him unable to control his lack of effort). The ALJ also cited other discrepancies, noting that Estorga testified he becomes agitated or suffers panic attacks when he leaves his house and is around people, noise, or cars, but he also said he is able to take public transportation and go grocery shopping (I also note that the medical records do not reflect any complaints of anxiety or panic attacks due to being around people). AR 79-80, 86-87, 89. The ALJ also relied on inconsistencies between Estorga's reported limitations in an October 2012 function report and treatment notes from around that same time. AR 40. In the function report, Estorga stated that he sleeps all day until it is time to pick his children up from school; that he usually does not cook but is able to prepare

_____

2457, 2461, 2687, 2690, 2694, 2698, 2702, 2707). Several home healthcare notes find Estorga's joint range of motion to be "within patient's norm," and only one reflects an abnormal finding. AR 2412, 2687, 2690, 2694, 2698, 2702, 2707. Estorga's rheumatologist in California consistently found (from March 2013 to July 2014) Estorga's joints in his hands to be tender and stiff. AR 2190, 2192, 2194, 2196, 2265. In August 2015, a rheumatologist observed normal joints but "weak thumb abduction" but, as noted by the ALJ, "appeared to focus more on treating the claimant's fibromyalgia," rather than his arthritis. AR 39, 2765.

cereal and frozen meals; that he cannot do housework, dishes, or laundry; that he grocery shops for a few hours at a time once a month; and that he can only walk a few blocks before needing to rest. AR 434-39. As the ALJ noted, however, Estorga reported helping his children get ready for school in the morning, taking them to school, doing housework, and making dinner in February 2012 (AR 1952); washing dishes, doing laundry, and grocery shopping, but only with assistance in December 2012 (AR 1481); swimming in June 2011 (AR 1320); and walking for twenty minutes a day to exercise in 2011 and February 2013 (AR 1337, 1359, 1365, 1368, 1811). Substantial evidence supports the ALJ's determination that Estorga provided inconsistent reports of his limitations and gave less than full effort during testing to evaluate his limitations, and the ALJ could discredit Estorga's subjective complaints on this basis. *See Pirtle v. Astrue*, 479 F.3d 931, 935 (8th Cir. 2007) (holding that ALJ gave good reasons for discounting claimant's credibility when the claimant "made inconsistent reports of her activities of daily living"); *Choate v. Barnhart*, 457 F.3d 865, 871-72 (8th Cir. 2006) (holding that the ALJ could consider, as one factor among others, inconsistencies between the claimant's reports of his activities of daily living and other evidence); *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006) ("The ALJ was entitled to draw conclusions about [the claimant's] credibility based on [testing] analyses indicating that [claimant] was exaggerating symptoms and giving less than his full effort.").

Despite rejecting many of the reasons given by the ALJ for discrediting Estorga's subjective complaints, two hold up: Estorga's complaints of memory and concentration problems are inconsistent with the record; and the record contains "discrepancies" calling Estorga's truthfulness into question. I believe this last reason is sufficient, standing on its own, to support the ALJ's credibility determination. *See King*, 2014 WL 1344194, at *14. Thus, I recommend finding that the ALJ gave a good reason, supported by substantial evidence, for discounting some of Estorga's subjective complaints.

### C. Weight to Medical Opinions

Estorga challenges the weight the ALJ assigned to the physical RFC opinion of his Iowa primary care physician, Dr. Carlson, and to the RFC opinions of one-time consultative examiners Drs. Katzenberg and Anderson. As an initial matter, I find it helpful to outline the substance of these opinions as compared to the ALJ's ultimate determination of Estorga's RFC. The ALJ limited Estorga to sedentary work, which involves occasionally lifting or carrying no more than ten pounds at a time, sitting for six hours at a time, and standing or walking for about two hours at a time (the ALJ did not address any limitations in the amount of time Estorga could be on his feet at one time) (AR 28). 20 C.F.R. § 416.967(a); SSR 96-9P, 61 Fed. Reg. 34478, 34480 (July 2, 1996) (noting "occasionally" is a term of art meaning "occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour workday"); SSR 83-10, 1983 WL 31251, at *5 (Jan. 1, 1983) (noting that "how often and how long a person will need to be on his or her feet" varies among sedentary jobs). Like the ALJ, Drs. Carlson and Anderson found Estorga could lift or carry ten pounds occasionally; Dr. Katzenberg, however, found that Estorga could never lift or carry due to the limited range of motion of his back and hips and his use of a cane to walk. AR 2207, 2369, 2751. The doctors varied in their opinions of Estorga's ability to sit and stand: Dr. Katzenberg found that he could sit without limitations (either at a time or in total) and that he could stand or walk for five to ten minutes at a time for a total of one to two hours; Dr. Anderson found that he could sit, stand, and walk for four hours each (at a time and in total); and Dr. Carlson found that he could sit for fifteen minutes at a time for a total of six hours "with accommodations," that he could walk for ten minutes at a time "with assistance" for a total of one hour, and that he could stand for five minutes at a time for a total of one hour (Dr. Carlson noted that with a walker, he believed Estorga could stand for thirty minutes at a time; and with a cane, "less"—but presumably more than the five minutes without a cane). AR 2208, 2370, 2752. The ALJ found that

Estorga needed to use a cane to ambulate, as did Dr. Katzenberg and Dr. Carlson; Dr. Anderson did not find a cane necessary. AR 28, 2208, 2370, 2752.

The ALJ found that Estorga could perform tasks involving frequent handling and fingering. AR 28; *see also Hulsey v. Astrue*, 622 F.3d 917, 924 (8th Cir. 2010) ("[A] 'frequent' activity or condition exists between one-third and two-thirds of the time."). Dr. Katzenberg found Estorga less limited than the ALJ, imposing no hand limitations, and Drs. Carlson and Anderson found him more so, limiting him to only occasional handling and fingering. AR 2209, 2371, 2753. The ALJ, like Dr. Katzenberg, found no limitations related to reaching, pushing, and pulling; Drs. Carlson and Anderson found some such limitations. AR 28, 2209, 2371, 2753. The ALJ did not impose any limitations related to Estorga's use of his feet. AR 28. Neither did Dr. Anderson. AR 2371. Dr. Carlson, on the other hand, found Estorga could never use his feet due to weakness and lack of control, and Dr. Katzenberg opined he could only occasionally do so due to limited range of motion and the use of a cane. AR 2209, 2753.

The ALJ further limited Estorga to only occasionally climbing stairs, stooping, kneeling, crouching, and crawling. AR 28. The ALJ also found Estorga could never climb ladders or balance. AR 28. The ALJ's opinion was consistent with that of Dr. Anderson in this regard. AR 2372. Dr. Katzenberg found Estorga could never do such things, and Dr. Carlson opined that Estorga could never do any of the activities except climbing stairs, which he found Estorga could do occasionally. AR 2210, 2754.

"It is the ALJ's function to resolve conflicts among [the opinions of] 'the various treating and examining physicians.'" *Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002) (quoting *Bentley v. Shalala*, 52 F.3d 784, 785-87 (8th Cir. 1995)). The ALJ considers the following factors to determine the weight to assign a medical opinion:

> (1) whether the source has examined the claimant; (2) the length, nature, and extent of the treatment relationship and the frequency of examination; (3) the extent to which the relevant evidence, "particularly medical signs and laboratory findings," supports the opinion; (4) the extent to which the opinion is consistent with the record as a whole; (5) whether the opinion is

22

related to the source's area of specialty; and (6) other factors "which tend to support or contradict the opinion."

*Owen v. Astrue*, 551 F.3d 792, 800 (8th Cir. 2008) (quoting the current 20 C.F.R. § 416.927(c)).[12]  The ALJ must give controlling weight to a treating-source opinion if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2).  "Whether the ALJ gives the opinion of a treating [source] great or little weight, the ALJ must give good reasons for doing so."  *Reece v. Colvin*, 834 F.3d 904, 909 (8th Cir. 2016).

The ALJ erroneously found that "Dr. Carlson examined the claimant on one occasion, in September 2015."  AR 37.  The record reflects that Estorga had five office visits with Dr. Carlson from May to July 2015; that Dr. Carlson ordered tests for Estorga in March and July 2015; that Dr. Carlson signed three emergency department notes for Estorga from June and August 2015 (reflecting his awareness of other treatment obtained by Estorga); and that Dr. Carlson was considered Estorga's primary care physician after Estorga moved to Iowa.  AR 2422, 2530, 2634, 2641, 2647, 2651, 2657, 2661, 2667, 2673, 2679, 2680, 2764.  Dr. Carlson also referred Estorga for a rheumatology consultation, and it is this September 2015 treatment note from the rheumatologist that the ALJ mistakenly believed to be the one treatment note in the record from Dr. Carlson.  *See* AR 37, 2764-66.

The ALJ discounted Dr. Carlson's opinion because he found it inconsistent with the rheumatologist's findings during her physical examination of Estorga.  AR 37.

---

[12] New regulations for evaluating medical opinions went into effect on March 27, 2017, and some, by their terms, apply retroactively.  *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017).  The Eighth Circuit has applied these new rules retroactively, which are substantively the same as the old rules.  *See, e.g.*, *Chesser v. Berryhill*, 858 F.3d 1161, 1164 (8th Cir. 2017).  I cite to the new regulations.

23

Although an opinion from a treating source[13] may be "given less weight if [it is] inconsistent with *the record as a whole*," *Stormo v. Barnhart*, 377 F.3d 801, 805-06 (8th Cir. 2004) (emphasis added); an ALJ cannot discount a treating physician's RFC opinion based on a finding of inconsistency with one treatment note, *see, e.g., Pates-Fire v. Astrue*, 564 F.3d 935, 944 (8th Cir. 2009) (holding that the ALJ could not discount a treating physician's RFC opinion based on an alleged inconsistency with one Global Assessment of Functioning (GAF) score of 58; rather, the ALJ had to consider the claimant's "total GAF score history," which demonstrated only four out of twenty-one GAF scores above 50).

The Commissioner suggests that the ALJ's error was harmless because the ALJ's reasoning is still applicable when considering Dr. Carlson's treatment notes, and the ALJ may "discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes." *Davidson v. Astrue*, 578 F.3d 838, 843 (8th Cir. 2009). The ALJ emphasized that "Dr. Carlson correlated many of the claimant's limitations to weakness[, y]et his physical exam findings [(the rheumatologist's findings)] failed to reflect any indication of motor weakness or neurological deficits." AR 37. As Estorga points out, however, unlike the rheumatologist, Dr. Carlson *did* find decreased strength in Estorga's hips, knees, ankles, and feet upon examination in May 2015. AR 2638. Contrary to the Commissioner's argument otherwise (and as recognized by the ALJ), Dr. Carlson based limitations related to Estorga's ability to stoop, kneel, crouch, and use his hands and feet, at least in part, on Dr. Carlson's finding of weakness. AR 2753-54. Dr. Carlson also twice evaluated Estorga's spinal range of motion and found it limited and

---

[13] Because the ALJ erred in determining the number of times Dr. Carlson had examined Estorga, the ALJ likely did not consider Dr. Carlson a treating source, as a physician who has examined a claimant only once cannot qualify as a treating source whose opinion may be entitled to controlling weight. *See Kennell v. Colvin*, No. 15-cv-03190-NKL, 2016 WL 223718, at *6 (W.D. Mo. Jan. 19, 2016); *Sorensen v. Colvin*, No. CIV 14-4065, 2015 WL 5029169, at *17-18 (D.S.D. Aug. 25, 2015) (collecting cases).

painful (the rheumatologist's note includes no such evaluation). AR 2635, 2676 (also noting normal range of motion of left shoulder, elbow, and hand), 2765; *see also* AR 2649, 2682 (emergency department notes signed by Dr. Carlson note normal back range of motion). Dr. Carlson also found, in May 2015, that straight leg tests resulted in back pain and that Estorga's gait was antalgic on both sides and required use of a walker. AR 2638. Substantial evidence does not support that Dr. Carlson's treatment records were inconsistent with his RFC opinion, especially not for the reasons given by the ALJ (involving another doctor's treatment note).[14] In addition, as noted above when discussing Estorga's subjective complaints, a claimant suffering from fibromyalgia often has normal neurological and other examinations, so although Dr. Carlson found normal neurological examinations (like the rheumatologist) (AR 2639, 2649, 2659, 2765), such evidence does not render his opinion inconsistent with his treatment notes (as the ALJ suggested (AR 37)). I recommend finding that the ALJ erred in assessing Dr. Carlson's opinion and remanding for the ALJ to further consider it (providing additional reasons, if any, for discounting the opinion).

Estorga also challenges the weight the ALJ assigned to the opinions of Dr. Anderson and Dr. Katzenberg, whose opinions (formed after a one-time consultative examination) are not entitled to any "special weight." *Perrymore v. Colvin*, 607 F. App'x 614, 615 (8th Cir. 2015) (per curiam) (citing *Kirby*, 500 F.3d at 709)). With regard to Dr. Katzenberg, Estorga challenges only the ALJ's evaluation of Dr. Katzenberg's opined limitations related to Estorga's ability to stand or walk, to which the ALJ assigned

---

[14] Moreover, although the rheumatologist found "grossly preserved" muscle strength, she did note "loose ligaments" in both of Estorga's knees (AR 2765), which can cause instability (Dr. Carlson based the limitations in stooping, kneeling, and crouching in part on "unsteadiness" (AR 2754)). *See Oliver v. Colvin*, No. 12-CV-00400-wmc, 2014 WL 941820, at *3 (W.D. Wis. Mar. 11, 2014) (noting doctor opined that "loose ligaments in [claimant's] knees . . . might be the reason for [claimant's] instability"). The rheumatologist also found "weak thumb abduction," (AR 2765), which does not seem inconsistent with Dr. Carlson's limitations in fingering and handling (AR 2753).

"great weight," finding them consistent with treatment records reflecting normal musculoskeletal and neurological findings (particularly in strength, reflexes, and sensation) and Estorga's regular use of an assistive device. AR 35. Dr. Katzenberg found Estorga could stand or walk for a total of two hours each day, like the ALJ, but the ALJ failed to recognize that Dr. Katzenberg also found Estorga could only stand or walk for five to ten minutes at a time (as Estorga argues). AR 2205, 2208.

As noted above during the discussion of Estorga's subjective complaints, almost all of the treatment records reflect normal neurological examinations, including sensation and reflexes. Many of the treatment records, particularly later treatment records, reflect objective observations that Estorga uses a cane or walker, walks slowly, and is unsteady on his feet. Although examinations of Estorga's range of motion were often normal, they were not overwhelming so. *Compare* AR 627, 1231, 1235, 1246, 1775, 1782, 1792, 1801, 2009, 2102, 2110, 2121, 2125, 2130, 2214-15, 2224, 2227, 2270, 2415, 2418, 2423, 2427, 2429, 2435, 2439, 2447, 2451, 2453, 2557, 2577, 2585, 2610, 2649 (treatment records from February 2012 to June 2015 reflecting normal range of motion, including in back or limbs), *with* AR 1477 (December 2012: consultative examiner finds good range of motion in all joints except spine and shoulders), AR 1692 (December 2012: Estorga reports arthritic flare-up from consultative examination, and provider observes back range of motion decreased due to pain), AR 2079 (August 2013: pain with range of motion and walking), AR 2205 (June 2014: Dr. Katezenberg found full range of motion of back, knees, ankles, shoulders, elbows, and arms, but limited mobility of hips), AR 2638-39 (May 2015: limited lumbar spine range of motion and flexion), AR 2457, 2461, 2467 (June 2015: abnormal range of motion, "pain affecting . . . movements"), AR 2676 (July 2015: normal range of motion of left shoulder and elbow, but active painful spinal range of motion and mild restriction in extension). As the ALJ recognized, the treatment records often reflect "diffuse tenderness" (AR 30), consistent with fibromyalgia. Although many treatment records reflect otherwise normal musculoskeletal examinations, as found by the ALJ, a number do not. *Compare* AR 1934 (January 2012: strength and

26

tone intact), AR 2200 (April 2012: rheumatologist notes no swelling or inflammation and that Estorga's symptoms are "vastly improved" on methotrexate, but discontinuing due to side effects), AR 1477 (December 2012: negative straight leg tests; normal motor strength in upper and lower extremities; normal muscle bulk and tone), AR 1511 (January 2013: normal back curvature), AR 1588 (April 2013: noting Estorga reports his arthritis is controlled by Remicade, which was later discontinued due to side effects; musculoskeletal limb and spine screening examinations are normal), AR 2270 (August 2014: normal strength, no swelling), AR 2386 (September 2014: no swelling in extremities, equal and appropriate muscle strength in arms and legs), AR 2370 (October 2014: Dr. Anderson noted normal spine and neck, shoulder, elbow, feet, and ankle joints with no swelling or inflammation), AR 2585 (November 2014: normal strength); AR 2577 (December 2014: normal strength; no tenderness; no swelling), AR 2610 (February 2015: normal strength); AR 2557 (May 2015: no swelling), *with* AR 1290 (February 2012: "feet sl[ightly] puffy"), AR 1692 (December 2012: back spasms, abnormal back curvature), AR 1685 (January 2013: "looks uncomfortable" but better than December 2012), AR 2190, 2192, 2194, 2196, 2265 (March 2013 through July 2014: rheumatologist notes no inflammation of synovial joints but stiffness in toe joints, hand joints, and knees), AR 2079 (August 2013: appears tired and weak, but no visible joint deformities or swelling). Given Estorga's severe impairment of fibromyalgia and the numerous objective observations in the treatment records reflecting his difficulties walking, the sometimes normal musculoskeletal examinations and normal neurological examinations do not support the ALJ's failure to include Dr. Katzenberg's limitation that Estorga could only walk for up to ten minutes at a time. I recommend remanding for the ALJ to further address this limitation.

The ALJ gave little weight to Dr. Anderson's opinion because his consultative examination showed "almost entirely unremarkable" findings, and it was thus unclear how he arrived at the limitations he imposed. AR 36. Dr. Anderson also opined that Estorga's arthritis was "fairly well controlled on current medications" (Estorga was

27

taking Remicade at the time, which was later discontinued due to side effects), that his problems seemed psychologically based, and that Estorga did "not give h[is] best effort on the physical [examination]." AR 2367-68. Estorga takes issue with the ALJ's reasoning for discounting Dr. Anderson's opinion based on the assumption that the ALJ erred in finding at step two that he did not suffer from a conversion disorder. Doc. 13 at 12-13. As discussed above, I have rejected that argument. The ALJ gave good reasons supported by substantial evidence for discounting Dr. Anderson's opinion.

### D. VE Hypothetical

An ALJ bears the burden of proving there are jobs in the national economy the claimant can perform. *See Gieseke v. Colvin*, 770 F.3d 1186, 1189 (8th Cir. 2014); *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005). "In making this determination, the ALJ may rely on testimony by a VE that is 'based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies.'" *Gieseke*, 770 F.3d at 1189 (quoting *Cox v. Astrue*, 495 F.3d 614, 620 (8th Cir. 2007)). To constitute substantial evidence, a VE's testimony must be based on a hypothetical question that "precisely" describes the claimant's limitations. *See Newton v. Charter*, 92 F.3d 688, 694-95 (8th Cir. 1996). A hypothetical posed to a VE "is sufficient if it sets forth the impairments which are accepted as true by the ALJ." *Haggard v. Apfel*, 175 F.3d 591, 595 (8th Cir. 1999) (quoting *Davis v. Shalala*, 31 F.3d 753, 755 (8th Cir. 1994)). Put another way, "the ALJ may exclude any alleged impairments that [the ALJ] . . . properly rejected as untrue or unsubstantiated." *Perkins v. Astrue*, 648 F.3d 892, 902 (8th Cir. 2011) (quoting *Hunt v. Massanari*, 250 F.3d 622, 625 (8th Cir. 2001)).

Here, the transcript of the administrative hearing reflects no hypothetical to the VE included the use of a cane to walk (as well as Estorga's other limitations), despite the ALJ's inclusion of the use of a cane in his RFC determination. AR 28. The transcript reflects that after the ALJ asked the VE about a hypothetical person with the ability to do light work and Estorga's other limitations (except use of a cane), the ALJ asked the VE:

> [T]ake this person in [the last hypothetical], but let's put them at sedentary
> work as that term is defined in the [Dictionary of Occupational Titles] and
> regulations, and would need a cane to ambulate, or just put cane or—well,
> put to ambulate. Leave out the cane. Now what happens, any jobs?

AR 102-04. The Commissioner argues that there is a transcription error and that rather than "leave out the cane," the ALJ said, "leave the cane." Doc. 16 at 15. In his reply brief, Estorga argues that if the transcript is incorrect, then the Commissioner must take action before the Social Security Administration to correct the transcript. Doc. 17 at 7. Estorga agrees that the ALJ did not say "leave out the cane," as reflected in the transcript, but argues that he said "leave out cane" (not "leave the cane"). *Id.*

The Commissioner relies on *Block v. Astrue*, 506 F. App'x 764, 771-72 (10th Cir. 2012), in which the Tenth Circuit held that a "transcription error" in the ALJ's hypothetical to the VE did not render "the vocational evidence . . . incompetent." In that case, although the transcript reflected that the ALJ asked the VE about a hypothetical person who "can't interact appropriately with others . . . and can't adapt," the VE's response (as reflected in the transcript) "was responsive to an inquiry about a hypothetical person who *can*" do such things. *Id.* at 771. The court further noted that a hypothetical asking about a person who "can't interact with others . . . , but not the general public" did not make linguistic sense, while the use of can was congruent with "but not the general public." *Id.* at 772. The court concluded that because a transcription error "must" have occurred, the vocational expert's testimony supported the ALJ's step-five determination. *Id.* at 771-72.

Here, unlike in *Block*, the transcript does not reflect that an error "must" have occurred. The VE's response to the ALJ's hypothetical does not suggest that use of a cane was included as a limitation (although neither does the VE's response reflect that use of a cane was not included). Indeed, when the VE asked, "You do want those same limitations as [the previous hypothetical], correct?" the ALJ responded, "Same limitations as [the previous hypothetical], but we're at sedentary rather than light" (making no mention of the addition of a cane). AR 104. Although the part of the ALJ's

29

hypothetical saying "put to ambulate" provides some linguistic support that the ALJ meant to include use of the cane to ambulate in the hypothetical, it does not rise to the level of linguistic inconsistency at issue in *Block*. In sum, on this record, it is far from certain that a transcription error occurred. As such, the VE's testimony—based on a hypothetical that does not include all of Estorga's limitations—does "not constitute substantial evidence to support a finding of no disability." *Newton*, 92 F.3d at 695.

### E. Type of Remand

Estorga requests that the case be remanded to the Social Security Administration for an award of benefits. "Ordinarily, when a claimant appeals from the Commissioner's denial of benefits and [the court] find[s] that such a denial was improper, [the court], out of [its] 'abundant deference to the ALJ,' remand[s] the case for further administrative proceedings." *Buckner v. Apfel*, 213 F.3d 1006, 1011 (8th Cir. 2000). The court may, however, remand for an award of benefits "if the record 'overwhelmingly supports'" a finding of disability. *Id.* (quoting *Thompson v. Sullivan*, 957 F.2d 611, 614 (8th Cir. 1992)). Here, treatment records seem to reflect that Estorga's impairments (and limitations) have gotten worse with time, and if all of the treatment records looked like those from 2015, I would likely find that the record overwhelmingly supports a finding of disability. But considering the record as a whole (particularly Estorga's earlier treatment records), I do not find that this standard has been met. Accordingly, I recommend remanding this case to the Social Security Administration for further proceedings consistent with this opinion. On remand, the ALJ should further consider Dr. Carlson's and Dr. Katzenberg's RFC opinions and obtain additional testimony from a VE based on a proper hypothetical that includes Estorga's use of a cane.

### III.    CONCLUSION

I recommend that the district court **reverse** the decision of the Commissioner, enter judgment in favor of Estorga, and **remand** to the Commissioner for further proceedings.

Objections to this Report and Recommendation must be filed within fourteen days of service in accordance with 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b).  Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. Fed. R. Civ. P. 72.  Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein.  *See United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** this 22nd day of June, 2018.

Kelly K.E. Mahoney
United States Magistrate Judge
Northern District of Iowa

31